UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SYNTHIA ST. LOUIS

Plaintiff,

-against-

CAPITAL REGION ORTHOPAEDIC
ASSOCIATES, P.C., D/B/A THE BONE & JOINT
CENTER, LORI BIRMINGHAM, CHLOE CITONE,
LEAH COITEUX, SARAH GARRETT, MARGARET
HUNT, KAITLYN KLINE, JUSTINE MULBERRY,
JONATHAN PROSALIK and MEGAN VETTER

Defendants.

---

**COMPLAINT**

***JURY TRIAL DEMANDED***
***Civil Case No.:*** 1:22-cv-586 (MAD/DJS)

Plaintiff, Synthia St. Louis ("Ms. St. Louis" or "Plaintiff"), by and through her attorneys, Girvin & Ferlazzo, P.C., as and for her Complaint against Capital Region Orthopedic Associates, P.C., d/b/a The Bone & Joint Center, Lori Birmingham, Chloe Citone, Leah Coiteux, Sarah Garrett, Margaret Hunt, Kaitlyn Kline, Justine Mulberry, Jonathan Prosalik, and Megan Vetter (collectively "Defendants"), states and alleges as follows:

## JURISDICTION AND VENUE

1.     This action arises from the discriminatory and retaliatory employment practices of Capital Region Orthopedic Associates, P.C., d/b/a The Bone and Joint Center ("CROA") which violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and/or the discriminatory and retaliatory employment practices of Defendants which violate the New York Executive Law § 290 *et seq*.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Ms. St. Louis' claims arise under 42 U.S.C. § 2000e *et seq.*

3.      This Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C § 1367, because Ms. St. Louis' claims under the New York State Executive Law arise from the same set of facts and circumstances and form part of the same case or controversy which give rise to her Title VII claims.

4.      Venue in the Northern District of New York is proper under 28 U.S.C. § 1391, as the unlawful discriminatory and retaliatory acts Ms. St. Louis experienced and complains of herein occurred in Albany, New York; that Ms. St. Louis is a resident of Albany County, New York; that CROA is located in Albany County, New York; and the individual Defendants are believed to reside in the Northern District of New York.

5.      Prior to commencing this lawsuit, Ms. St. Louis filed a timely charge of discrimination, harassment, and retaliation against Defendants with the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge No. 16G-2021-01677.

6.       In March 2022, Ms. St. Louis received a "Dismissal and Notice of Rights" letter from the EEOC that was dated March 8, 2022, a true and accurate copy of which is attached hereto as Exhibit "A".

7.      This action has been commenced within ninety (90) days of Ms. St. Louis receiving the Dismissal and Notice of Rights letter (Exhibit A) from the EEOC.

8.      Ms. St. Louis has exhausted all required administrative remedies that were available to her prior to filing suit on her claims.

## PARTIES

9.      Ms. St. Louis is, and at all times material hereto was, a citizen of the State of New York, residing in the County of Albany, State of New York.

10.      At all times material hereto, Ms. St. Louis was female, Black, and of Haitian origin.

11.      At all times material hereto, Defendant Capital Region Orthopedic Associates, P.C., d/b/a The Bone and Joint Center ("CROA"), was a domestic professional service corporation located in the County of Albany, State of New York.

12.      At all times material hereto, Defendant Lori Birmingham ("Birmingham"), was employed as the Director of Human Resources for CROA, and a resident of the County of Schenectady, State of New York.

13.      At all times material hereto, Defendant Jonathan Prosalik ("Prosalik"), was employed as the Appointment Center Supervisor and Medical Records Supervisor for CROA, and a resident of the County of Rensselaer, State of New York.

14.      At all times material hereto, Defendant Chloe Citone ("Citone"), was employed as an Appointments Receptionist for CROA, and a resident of the County of Schenectady, State of New York.

15.      At all times material hereto, Defendant Leah Coiteux ("Coiteux"), was employed as a Call Center Representative for CROA, and a resident of the County of Rensselaer, State of New York.

16.      At all times material hereto, Defendant Sarah Garrett ("Garrett"), was employed as a Call Center Representative for CROA, and a resident of the County of Albany, State of New York.

17.    At all times material hereto, Defendant Margaret Hunt ("Hunt"), was employed as a Call Center Representative for CROA, and a resident of the County of Albany, State of New York.

18.    At all times material hereto, Defendant Kaitlyn Kline ("Kline"), was employed as a Call Center Representative for CROA, and a resident of the County of Albany, State of New York.

19.    At all times material hereto, Defendant Justine Mulberry ("Mulberry"), was employed as a Call Center Representative for CROA, and a resident of the County of Rensselaer, State of New York.

20.    At all times material hereto, Defendant Megan Vetter ("Vetter"), was employed as a Call Center Representative for CROA, and a resident of the County of Albany, State of New York.

21.    At all times material hereto, CROA was an "employer" within the meaning of 42 U.S.C. § 2000e(b), in that it engages in an industry affecting commerce and employs more than the requisite number of persons for the requisite duration of time under Title VII.

22.    At all times material hereto, CROA employed more than twenty (20) employees.

23.    At all times material hereto, Defendant CROA was an "employer" within the meaning of New York Executive Law § 292(5).

24.    At all times material hereto, Defendants Birmingham, Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter were "employees" within the meaning of New York Executive Law § 292(6).

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

25.     In October 2019, Ms. St. Louis was hired by CROA to work in its Call Center as a Call Center Representative.

26.     The Call Center is a small, windowless room comprised of cubicles where Call Center Representatives receive calls from patients seeking to schedule appointments with CROA's participating medical providers.

27.     On or about October 14, 2019, Ms. St. Louis attended her first day of work with CROA.

28.     Ms. St. Louis' immediate supervisor at CROA was Prosalik.

29.     Prosalik worked in close proximity to Ms. St. Louis and Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry and Vetter.  As a result, Prosalik could hear and observe what took place in Ms. St. Louis' work environment, as described in more detail herein.

30.     Throughout Ms. St. Louis' employment with CROA, Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter directed discriminatory and harassing statements and actions towards Ms. St. Louis on a daily or nearly daily basis because of her sex, race, ethnicity, national origin, and ethnic hairstyle, which created a hostile work environment for Ms. St. Louis.

31.     The discriminatory and harassing conduct of Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter that was directed at Ms. St. Louis because of her sex included, but was not limited to: (1) vulgar and obscene statements directed at Ms. St. Louis about sex, including discussions about vaginal sex,  oral sex,  anal sex  and group sex; (2) vulgar and obscene references made to Ms. St. Louis about sexual body parts, including discussions about penis size, breast size, buttock size, menstrual cycles and genital hair removal; (3) vulgar and

obscene questions posed to Ms. St. Louis about sex, including questions posed to Ms. St. Louis about whether she engages in anal sex, questions about the size is of her husband's penis, and questions about the sexual positions that Ms. St. Louis engages in with her husband; (4) questions and comments directed to Ms. St. Louis about her bra, breasts and buttocks; (5) sexually oriented gestures made in Ms. St. Louis' presence, including but not limited to a discussion and demonstration of "the shocker", which refers to the act of inserting the index and middle fingers into a vagina and the little finger into the recipient's anus; (6) physical assaults of a sexual nature, including grabbing and slapping Ms. St. Louis' buttocks on two separate occasions, touching her breasts, and massaging her shoulders; and (7) regular and routine use of profanity such as the word "fuck".

32.     The discriminatory and harassing conduct of Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter that was directed at Ms. St. Louis because of her race, ethnicity, national origin and ethnic hairstyle included, but was not limited to: (1) directing racial slurs and epithets at Ms. St. Louis and other minority CROA employees who worked in the Call Center, including use of the word "nigger"; (2) using racially discriminatory terms to refer to Ms. St. Louis' hair as "nappy" and referring to Ms. St. Louis as "black mold"; (3) mocking and ridiculing Ms. St. Louis' Haitian accent; (4) making derogatory comments about Haitian food and about Haitian people, including posing questions to Ms. St. Louis about whether she "came here on a boat, requiring Ms. St. Louis to use an upstairs microwave in connection with statements to the effect that Haitian food stinks and that Haitian people eat cats and dogs; and (5) telling Ms. St. Louis that she should "go back to her own county if she can't speak English" and making a reference to Ms. St. Louis coming to America "on a boat".

33.     Ms. St. Louis recalls some, but not all of the specific discriminatory and harassing events that occurred during her employment with CROA.

34.     On Ms. St. Louis' first day of work for CROA, while she was being trained on how to perform the duties of Call Center Representative, Defendant Garrett commented directly to Ms. St. Louis: "damn girl you have a fat ass I think this chair is going to be too small for you, I thought I was the only one with a fat ass downstairs, but that ass is real juicy and look good on them pants, I wonder what position your man be giving you while you fucking him and how big is his dick". Shortly after making these comments, Defendant Garrett approached Ms. St. Louis from behind and proceeded to grab Ms. St. Louis' buttocks.  Ms. St. Louis objected to Defendant Garrett touching her buttocks.

35.     On Ms. St. Louis' first day of work for CROA, Defendant Citone made a comment about receiving "good ass dick" the night before.  The comment was made in the presence of Ms. St. Louis and, among others, Prosalik.

36.     On Ms. St. Louis' first day of work for CROA, Defendant Garrett made a comment about "eating this girl out".  The comment was made in the presence of Ms. St. Louis and, among others, Prosalik, Kline, Coiteux, Mulberry and Vetter.

37.     On Ms. St. Louis' second day of work, October 15, 2019, Ms. St. Louis was assigned to be trained by Defendant Citone.  At the start of Ms. St. Louis' training, Defendants Citone, Coiteux, Kline and Mulberry engaged in conversation about their sex lives.  This graphic conversation included discussions about the sexual positions they preferred, and the sizes of their partners' genitalia.  Defendants Citone, Coiteux, Kline and Mulberry attempted to include Ms. St. Louis in the conversation by asking Ms. St. Louis what sexual positions she enjoys, and suggesting that Ms. St. Louis try a sexual position known as "doggy style".  As the conversation continued,

7

Defendant Garrett arrived at work and proceeded to join Defendants Citone, Coiteux, Kline and Mulberry's conversation.  At no point in time did Ms. St. Louis participate in the conversation, as she found it to be highly offensive and inappropriate for the workplace.  At the end of the conversation, Defendant Garrett approached Ms. St. Louis and asked her if she was a "little church girl".  Ms. St. Louis believes that this comment was made by Defendant Garrett because Ms. St. Louis had not joined in the discussion about sexual topics.

38.     During Ms. St. Louis' first month of employment with CROA, Ms. St. Louis continued to endure and was repeatedly subjected to unlawful discrimination and harassment in the Call Center.

39.     During one event, Defendant Garrett openly discussed being bitten while engaging in oral sex.

40.     During one event, Defendants Garrett and Citone openly discussed anal sex.

41.     On or about November 25, 2019, Ms. St. Louis requested a private meeting with Prosalik to complain about the ongoing harassment and discrimination she was experiencing in the Call Center.

42.     While meeting with Defendant Prosalik on or about November 25, 2019, Ms. St. Louis informed Defendant Prosalik about the aforementioned sexual statements and conduct she was experiencing in the Call Center.  Defendant Prosalik dismissed Ms. St. Louis' concerns and told her in sum and substance that her co-workers were "just fooling around" and that Ms. St. Louis "needed to relax".  Upon information and belief, Defendant Prosalik told other CROA employees that Ms. St. Louis had raised concerns to him about their inappropriate conduct in the Call Center, including but not limited to Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry and Vetter.

43.     After Ms. St. Louis complained to Defendant Prosalik about the discriminatory and harassing conduct she was experiencing in the Call Center, no actions were taken by Defendants Prosalik, Birmingham or CROA.

44.     After Defendant Prosalik revealed the fact that Ms. St. Louis had complained to him about the ongoing harassment and discrimination she was experiencing with, among others, Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry and Vetter, those Defendants began retaliating against Ms. St. Louis.

45.     Between November 25, 2019, and January 25, 2020, Ms. St. Louis continued to be subjected to discrimination and harassment in the Call Center, and retaliation by the Defendants. By January 27, 2020, the harassment, discrimination and retaliation towards Ms. St. Louis had become so severe that Ms. St. Louis requested a meeting with Defendant Birmingham, who is CROA's Director of Human Resources.

46.     On January 27, 2020, Ms. St. Louis complained to Defendant Birmingham that she was experiencing discrimination and harassment in the Call Center because of her sex, race, ethnicity, national origin and ethnic hairstyle.  Specifically, Ms. St. Louis informed Defendant Birmingham that: her co-workers had referred to her hair as "nappy"; that they had commented about Ms. St. Louis' "fat ass"; that they repeatedly asked Ms. St. Louis inappropriate questions that are sexual in nature; and that they had made disparaging comments about Haitian food. Ms. St. Louis informed Defendant Birmingham of other inappropriate conduct that she had witnessed including but not limited to: sexual discussions in the Call Center; employees sleeping in the Call Center; employees wearing pajama pants and flip flops in the Call Center; pets being brought into the Call Center; non-employees congregating in the Call Center in potential violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); and CROA patients being

placed on hold for extended periods of time while sexually explicit and other inappropriate conversations and conduct was taking place.  Ms. St. Louis emphasized to Defendant Birmingham that the inappropriate conduct of her co-workers occurred on a daily basis and was directed at Ms. St. Louis because of her sex, race, ethnicity, national origin and ethnic hairstyle.

47.     During the January 27, 2020 meeting with Defendant Birmingham, Ms. St. Louis identified several co-workers by name who were specifically involved in the harassment and discrimination, including Defendants Citone, Garrett, Hunt, Kline, Mulberry and Vetter.

48.     During the January 27, 2020 meeting with Defendant Birmingham, Ms. St. Louis complained to Defendant Birmingham that she previously brought her concerns to Defendant Prosalik and that he had failed to take any remedial action to address the situation.

49.     During the January 27, 2020 meeting with Defendant Birmingham, Ms. St. Louis expressed her fear of retaliation, and specifically reported that Defendant Citone made comments that clearly referenced an intention to retaliate against Ms. St. Louis for objecting to her harassment and discriminatory conduct and/or for raising her concerns to Defendant Prosalik.

50.     During the January 27, 2020 meeting with Defendant Birmingham, Defendant Birmingham advised Ms. St. Louis that she had personally received a complaint from a patient of CROA wherein the patient complained that s/he could hear Call Center employees having inappropriate sexual conversations in the background.  Defendant Birmingham further stated that when she had recently visited the Call Center, she observed employees wearing pajama pants and slippers in the officer, and having their feet up on their desk. At the conclusion of the meeting, Defendant Birmingham assured Ms. St. Louis that CROA would immediately step in and put an end to the offensive behavior.

51.     After Ms. St. Louis met with Defendant Birmingham on January 27, 2020, CROA failed to take any steps to address the discrimination and harassment that was taking place in the Call Center.  As a result, the harassment and discrimination of Ms. St. Louis continued.

52.     On or about January 29, 2020, just two days after Ms. St. Louis' meeting with Birmingham, Defendant Garrett grabbed Ms. St. Louis' buttocks and made the statement "I wanted to see if it was real or fake".

53.     On February 3, 2020, Ms. St. Louis' husband brought Ms. St. Louis a birthday gift at work.  Upon learning that it was Ms. St. Louis' birthday, Defendant Garrett remarked "they don't celebrate snitches' birthdays around here".  Defendant Garrett's reference to "snitches" confirmed to Ms. St. Louis that Defendants Birmingham and/or Prosalik had revealed the fact that Ms. St. Louis had complained about the conduct of her coworkers in the Call Center.

54.     Shortly after Garrett made the comment about "snitches', Ms. St. Louis walked over to the refrigerator located near Defendant Prosalik's desk.  As Ms. St. Louis bent down to reach into the refrigerator, Defendant Prosalik asked Ms. St. Louis "what size bra do you wear"? In response, Ms. St. Louis asked Prosalik why he was inquiring about her bra size, to which Defendant Prosalik stated that Ms. St. Louis' "boobs were big and poky", and she "may need to get a different bra or a bigger size".

55.     On or about February 6, 2020, Ms. St. Louis scheduled another meeting with Defendant Birmingham as a result of CROA's failure to take any action in response to Ms. St. Louis' January 27, 2020 complaints.  A meeting subsequently occurred at which Ms. St. Louis reiterated her previous complaints and emphasized that the harassment and discrimination continued to occur on a daily basis.  Defendant Birmingham did not take any action for almost two

more weeks, during which time the discriminatory and harassing behavior continued in the Call Center.

56.     On or about February 18, 2020, Birmingham and the Call Center Operations Manager held a mandatory meeting with the employees in the Call Center.  Before the meeting began, Birmingham directed the Call Center employees to place their personal cell phones in a basket in an effort to prevent anyone from recording the meeting.  Once the Call Center employees' cell phones had been collected Birmingham briefly addressed the Call Center employees. Birmingham generally referenced the fact that patients had complained about overhearing inappropriate sexual conversations between Call Center employees, that these conversations were causing patients to be placed on hold for extended periods of time, and/or that calls from patients went unanswered.  The emphasis of the conversation was the inability of patients to speak with a Call Center Representative to schedule appointments, not that such conduct was completely inappropriate for the workplace and a violation of CROA's policies prohibiting unlawful discrimination and harassment.  At no point during the meeting did Defendant Birmingham address the serious concerns of sex, race, ethnicity, national origin and ethnic hairstyle discrimination and harassment that Ms. St. Louis had brought to Defendants Prosalik and Birmingham's attention on multiple prior occasions.

57.     After meeting with the Call Center employees on or about February 18, 2020, Birmingham did not take any further action to address the concerns that had been raised to her by Ms. St. Louis.  As a result, the discrimination and harassment of Ms. St. Louis continued at CROA. Ms. St. Louis did not complain again, however, because she believed it was futile to do so, and that she would experience further incidents of retaliation.

58.     On or about March 27, 2020, Ms. St. Louis and three (3) other Call Center Representatives were laid off as part of a purported reduction in force necessitated by the emergence of the COVID-19 pandemic.

59.     CROA used the COVID-19 pandemic as a pretext to terminate Ms. St. Louis for opposing the unlawful discriminatory and harassing conduct that had been taking place in the Call Center for more than five months.

60.     Shortly after Ms. St. Louis was laid off, CROA rehired the Call Center Representatives it had laid-off, except for Ms. St. Louis.  Upon information and belief, in or around the same time, CROA hired several new Call Center Representatives, but did not offer reemployment to Ms. St. Louis.

61.     Ms. St. Louis was terminated, and CROA did not rehire her in retaliation for Ms. St. Louis opposing egregious unlawful discrimination and harassment at CROA.

### AS AND FOR A FIRST CAUSE OF ACTION
### UNDER TITLE VII OF THE CIVIL RIGHTS ACTS OF 1964
### AGAINST DEFENDANT CROA FOR DISCRIMINATION AND
### HARRASSMENT ON ACCOUNT OF SEX,
### RACE, ETHNICITY AND NATIONAL ORIGIN

62.     Ms. St. Louis realleges and reincorporates by reference each and every allegation of this Complaint as if fully set forth herein.

63.     CROA, through its agents and employees, discriminated against Ms. St. Louis in her employment by subjecting her to a hostile work environment on account of her sex, race, ethnicity and national origin, and by subjecting Ms. St. Louis to unequal terms and conditions of employment, as set forth in the preceding factual paragraphs.

64.     CROA knew and/or should have known that Ms. St. Louis was subject to a hostile work environment through its agents and employees, including Defendants Birmingham and Prosalik.

65.     CROA, through its agents and employees, including Defendants Birmingham and Prosalik, failed to take any action to stop the unlawful discrimination and harassment from occurring in Ms. St. Louis' workplace

66.     CROA lacked any business reason or justification for the aforesaid disparate treatment of Ms. St. Louis, and subjected Ms. St. Louis to a hostile work environment on account of her sex, race, ethnicity and national origin in violation of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

67.     As a direct result of the unlawful actions of CROA, Ms. St. Louis has suffered and will continue to suffer emotional and psychological trauma, distress, humiliation, and embarrassment, as alleged in the proceeding paragraphs of the Complaint.

68.     As a result of CROA's unlawful acts, Ms. St. Louis is entitled to the maximum monetary damages and penalties available by law, as well as costs and attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION UNDER TITLE VII OF THE CIVIL RIGHTS ACTS OF 1964 AGAINST DEFENDANT CROA FOR RETALIATION

69.     Ms. St. Louis realleges and reincorporates by reference each and every allegation of this Complaint as if fully set forth herein.

70.     Title VII forbids an employer from retaliating against an employee because of the employee's opposition to "any practice made an unlawful practice" by Title VII, or the employee's participation in "an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

71.     Ms. St. Louis opposed practices made unlawful by Title VII when she told Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter that their conduct was discriminatory, harassing, offensive and unwanted, which is a protected activity under Title VII.

72.     Ms. St. Louis opposed practices made unlawful by Title VII when she told Defendant Prosalik that his conduct was discriminatory, harassing, offensive and unwanted, and when Ms. St. Louis complained to Defendant Prosalik about the discriminatory, harassing, retaliatory, offensive and unwanted conduct of Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry and Vetter, which are protected activities under Title VII.

73.     Ms. St. Louis opposed practices made unlawful by Title VII when she complained to Birmingham about the discriminatory, harassing, retaliatory, offensive and unwanted conduct of Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter, which is a protected activity under Title VII.

74.     CROA, through its agents and employees, wrongfully terminated Ms. St. Louis' employment in retaliation for her complaints of discrimination and harassment as set forth in the preceding factual paragraphs.

75.     There is a causal connection between Ms. St. Louis' protected activities and the decision to terminate her employment.

76.     Ms. St. Louis' termination as part of a purported reduction in force is a pretext for unlawful retaliation in violation of Title VII.

77.     CROA lacked any business reason or justification for terminating Ms. St. Louis' employment in violation of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

78.     As a direct result of CROA's retaliatory termination of Ms. St. Louis' employment, Ms. St. Louis has suffered and will continue to suffer loss of income, loss of employment benefits, loss of career opportunities, damage to her reputation, humiliation, emotional distress, pain and suffering.

79.     As a result of CROA's unlawful acts, Ms. St. Louis is entitled to the maximum monetary damages and penalties available by law, as well as costs and attorneys' fees.

**AS AND FOR A THIRD CAUSE OF ACTION
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
AGAINT DEFENDANT CROA FOR DISCRIMINATION AND
HARRASSMENT ON ACCOUNT OF SEX, RACE,
ETHNICITY, NATIONAL ORIGIN AND ETHNIC HAIRSTYLE**

80.     Ms. St. Louis realleges and reincorporates by reference each and every allegation of this Complaint as if fully set forth herein.

81.     New York Executive Law § 296(1)(a) makes it unlawful "[f]or an employer . . . because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

82.     CROA was Plaintiff's employer as defined by New York Executive Law § 292(5).

83.     CROA, through its agents and employees, discriminated against Ms. St. Louis in her employment by subjecting her to a hostile work environment on account of her sex, race, ethnicity, national origin and ethnic hairstyle, and by subjecting Ms. St. Louis to unequal terms and conditions of employment, as set forth in the preceding factual paragraphs.

84.     CROA knew and/or should have known that Ms. St. Louis was subject to a hostile work environment through its agents and employees, including Birmingham and Prosalik.

85.     CROA, through its agents and employees, including Defendants Birmingham and Prosalik, failed to take any action to stop the unlawful discrimination and harassment from occurring in Ms. St. Louis' workplace

86.     CROA lacked any business reason or justification for the aforesaid disparate treatment of Ms. St. Louis, and subjected Ms. St. Louis to a hostile work environment on account of her sex, race, ethnicity, national origin and ethnic hairstyle in violation of New York State Human Rights Law § 296.

87.     Based upon the aforementioned actions of the Defendants, CROA violated New York Executive Law § 296(1)(a).

88.     As a direct result of the unlawful actions of CROA, Ms. St. Louis has suffered and will continue to suffer emotional and psychological trauma, distress, humiliation, and embarrassment, as alleged in the proceeding paragraphs of the Complaint.

89.     As a result of CROA's unlawful acts, Ms. St. Louis is entitled to the maximum monetary damages and penalties available by law, as well as costs, attorneys' fees, and other recoverable damages.

**AS AND FOR A FOURTH CAUSE OF ACTION
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
AGAINT DEFENDANT CROA FOR RETALIATION**

90.     Ms. St. Louis realleges and reincorporates by reference each and every allegation of this Complaint as if fully set forth herein.

91.     New York Executive Law § 296(1)(e) makes it unlawful "For any employer…to discharge . . . any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding."

92.     NYS Executive Law §296(7) makes is unlawful "for any person engaged in any [protected] activity…to retaliate or discriminate against any person because he or she has opposed any practices forbidden under [the NYS Human Rights Law] or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

93.     Ms. St. Louis complained to Defendant Prosalik, her immediate supervisor, and Defendant Birmingham, CROA's Director of Human Resources, regarding the Defendants' unlawful employment practices of sexual harassment, race discrimination, ethnicity discrimination, national origin discrimination and ethnic hairstyle discrimination.

94.     Ms. St. Louis' complaints to Defendants Prosalik and Birmingham are protected activities under Executive Law §§ 296(1)(e) and 296(7).

95.     Ms. St. Louis opposed practices made unlawful by the New York State Human Rights Law when she told Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter that their conduct was discriminatory, harassing, retaliatory, offensive and unwanted.

96.     Ms. St. Louis opposed practices made unlawful by the New York State Human Rights Law when she told Defendant Prosalik that his conduct was discriminatory, harassing, retaliatory, offensive and unwanted, and when Ms. St. Louis complained to Defendant Prosalik about the discriminatory, harassing, retaliatory, offensive and unwanted conduct of Citone, Coiteux, Garrett, Hunt, Kline, Mulberry and Vetter.

97.     Ms. St. Louis opposed practices made unlawful by the New York State Human Rights Law when she complained to Defendant Birmingham about the discriminatory, harassing, retaliatory, offensive and unwanted conduct of Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter.

98.     Defendants Birmingham, Prosalik, Citone, Garrett, Kline, Mulberry, Coiteux, Vetter, and Hunt engaged in a campaign of retaliation against Ms. St. Louis for opposing unlawful discrimination and harassment at CROA.

99.     As Ms. St. Louis' employer, CROA had a duty and responsibility to ensure that Ms. St. Louis was not subject to retaliation for actions taken in furtherance of protecting herself and her fellow employees at CROA from harassment and discrimination in the workplace.

100.    CROA was aware of Ms. St. Louis' protected activity and terminated her from her employment in retaliation for the same.

101.    CROA, through its agents and employees, wrongfully terminated Ms. St. Louis' employment in retaliation for her complaints of discrimination and harassment as set forth in the preceding factual paragraphs.

102.    CROA knowingly terminated Ms. St. Louis because she opposed discrimination and harassment at CROA that violated the New York State Human Rights Law.

103.    In terminating Ms. St. Louis for opposing discrimination and harassment at CROA, the Defendants unlawfully retaliated against Ms. St. Louis in violation of the New York State Human Rights Law.

104.    As a direct and proximate result of CROA's retaliatory acts, Ms. St. Louis has suffered and continues to suffer monetary, and/or economic damages, including but not limited to, loss of past and future income and retirement benefits for which Ms. St. Louis is entitled to an award of damages.

105.    As a direct and proximate result of CROA's retaliatory acts, Ms. St. Louis has suffered, and continues to suffer mental anguish and emotional distress for which Ms. St. Louis is entitled to an award of monetary damages.

106.    As a direct and proximate results of CROA's unlawful and discriminatory conduct in violation of NYS Human Rights Law, Ms. St. Louis has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief, in addition to costs and reasonable attorney's fees.

107.    As a result of CROA's unlawful acts, Ms. St. Louis is entitled to the maximum monetary damages and penalties available by law, as well as costs, attorneys' fees, and other recoverable damages.

**AS AND FOR A FIFTH CAUSE OF ACTION
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
AGAINT DEFENDANTS BIRMINGHAM, CITONE, COITEUX,
GARRETT, HUNT, KLINE, MULBERRY, PROSALIK AND
VETTER FOR AIDING AND ABETTING CROA'S VIOLATION
OF THE NEW YORK STATE HUMAN RIGHTS LAW**

108.    Ms. St. Louis realleges and reincorporates by reference each and every allegation of this Complaint as if fully set forth herein.

109.    CROA, through its agents and employees, discriminated against Ms. St. Louis in her employment by subjecting her to a hostile work environment on account of her sex, race, ethnicity, national origin and ethnic hairstyle by subjecting Ms. St. Louis to unequal terms and conditions of employment, as set forth in the preceding factual paragraphs, in violation of the New York State Human Rights Law.

110.    CROA knew and/or should have known that Ms. St. Louis was subject to a hostile work environment through its agents and employees, including Birmingham and Prosalik.

111.    CROA lacked any business reason or justification for the aforesaid disparate treatment of Ms. St. Louis, and subjected Ms. St. Louis to a hostile work environment on account of her sex, race, ethnicity, national origin and ethnic hairstyle in violation of New York State Human Rights Law § 296.

112.    CROA, through its agents and employees, wrongfully terminated Ms. St. Louis' employment in retaliation for her prior complaints of discrimination and harassment as set forth in the preceding factual paragraphs, in violation of the New York State Human Rights Law.

113.    CROA lacked any business reason or justification for terminating Ms. St. Louis' employment in violation of New York State Human Rights Law § 296.

114.    Defendants Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter directly participated in the discrimination and harassment of Ms. St. Louis on account of her sex, race, ethnicity, national origin and ethnic hairstyle that is prohibited by the New York State Human Rights Law.

115.    Defendants Birmingham, Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter directly participated in the retaliation against Ms. St. Louis for opposing discrimination and harassment that is prohibited by the New York State Human Rights Law.

116.    Defendants Birmingham, Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter aided and abetted CROA's violations of the Human Rights Law in violation of Section § 296(6) of the Human Rights Law.

117.    As a result of aiding and abetting CROA's violations of the New York State Human Rights Law, Ms. St. Louis is entitled to the maximum monetary damages and penalties available by law against Defendants Birmingham, Citone, Coiteux, Garrett, Hunt, Kline, Mulberry, Prosalik and Vetter, as well as costs, attorneys' fees, and other recoverable damages.

**WHEREFORE**, Plaintiff Synthia St. Louis prays for the following relief:

a.    That the Court accept jurisdiction over this matter.

b.    That the Court empanel a jury to hear this case.

c.    That the Court issue an order awarding Ms. St. Louis:

i.      Upon each of the causes of action in this Complaint, award Ms. St. Louis compensatory damages and, to the extent they are permitted by law, award Ms. St. Louis punitive damages;

ii.      Award Ms. St. Louis damages for the emotional and psychological trauma, distress, humiliation, and embarrassment she experienced as a result of the actions of Defendants as described herein;

iii.      Award Ms. St. Louis punitive damages under Title VII and the New York State Human Rights Law.

iv.      Award Ms. St. Louis reasonable attorneys' fees, as provided by 42 U.S.C. § 2000e-5(k) and the New York State Human Rights Law;

v.      Award Ms. St. Louis the costs and disbursements of this action;

vi.      Award Ms. St. Louis interest as provided by law; and

vii.      Award Ms. St. Louis such other and further relief as this Court deems just and proper.

### *JURY TRIAL IS HEREBY DEMANDED*

Dated: June 3, 2022            GIRVIN & FERLAZZO, P.C.
Albany, New York

By:

Scott P. Quesnel, Esq.
Bar Roll No.: 513710
*Attorneys for Plaintiff*
*Synthia St. Louis*
20 Corporate Woods Blvd., 2nd Floor
Albany, New York 12211
Telephone: (518) 462-0300
Facsimile: (518) 462-5037
Email: spq@girvinlaw.com